No. 57,003

CITY OF KANSAS CITY, KANSAS, a Municipal Corporation, and the BOARD OF PUBLIC UTILITIES OF THE CITY OF KANSAS CITY, KANSAS, *Appellees*, v. CARPENTERS DISTRICT COUNCIL OF KANSAS CITY, *et al.*, *Appellants*.

(699 P.2d 493)

Opinion filed May 10, 1985.

*Steve A. J. Bukaty*, of Blake & Uhlig, P.A., of Kansas City, argued the cause and *William S. Robbins, Jr.*, of the same firm, and *Gibson Langsdale*, of Kansas City, Missouri, were with him on the briefs for appellant Carpenters District Council of Kansas City.

*Joseph W. Moreland*, of Blake & Uhlig, P.A., of Kansas City, argued the cause and *William S. Robbins, Jr.*, of the same firm, was with him on the briefs for appellant I.A.M. District No. 71, and *John P. Hurley*, of Jolley, Moran, Walsh, Hager & Gordon, of Kansas City, Missouri, was on the briefs for appellant I.B.E.W. Local No. 53.

*Kathryn Pruessner Peters*, assistant city attorney, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is an appeal by three labor unions from an injunction prohibiting striking by public employees and prohib-

iting the stationing of an informational picket at the employees' gate protesting wages paid by a nonunion subcontractor.

The Board of Public Utilities (BPU) is an administrative agency of Kansas City, Kansas, organized and existing under the laws of the State of Kansas for the purpose of managing the municipally-owned electric and water utilities. Though it opted out of the provisions of the Kansas Employer-Employee Relations Act, BPU has voluntarily met and conferred with certain labor unions concerning wages, hours and working conditions at its plants. The unions are the Carpenters District Council; International Association of Machinists and Aerospace Workers, District No. 71, Local No. 92 (IAM); Painters District Council No. 3; and International Brotherhood of Electrical Workers, Local No. 53 (IBEW).

BPU entered into a contract to have maintenance performed on the turbine of its Nearman Creek Power Station with Creole Production Service, Inc., which proposed to use nonunion laborers. Work commenced under the contract on March 1, 1984. Work was to last approximately 30 days.

There are two gates at the Nearman Creek Power Station, one for employees off of 55th Street in Kansas City, Kansas, and one for contractors off of 49th Street. The contractors' gate, for the past two to three years, has had a sign stating: "Construction Workers Entrance." The employees' gate, for the same period of time, has had a sign stating: "This gate is for the exclusive use of BPU employees and visitors only. This gate will not be used by construction employees or for deliveries to contractors." The Creole personnel used the contractors' gate.

On March 7, 1984, prior to 7:00 a.m., an informational picket was placed at the Nearman Creek Power Station employees' gate by the Carpenters District Council. The picket banner stated:

"NOTICE TO PUBLIC

CREOLE

are performing carpentry and related work at this jobsite at wage rates and fringes below standards obtained by our union. We have no dispute with any other employer.

CARPENTERS DISTRICT COUNCIL OF GREATER KANSAS CITY AND VICINITY."

The plant superintendent at BPU requested the picket move to the contractors' gate that morning, but the picket refused to move. The BPU acting general manager hand-delivered a letter

to the Carpenters District Council representative at 9:30 p.m. on March 7, 1984, requesting the picket be moved to the contractors' gate. The general manger also spoke with another Carpenters representative at 8:30 a.m. on the following morning of March 8, 1984, again requesting the picket be moved to the contractors' gate.

As a result of the placement of the picket at the employees' gate on March 7, 1984, no operators or maintenance workers at the Nearman Creek station reported to work. These·people were all members of the IAM and IBEW unions. Several of the people who failed to report to work called in and said they were not reporting to work because of the picket.

The news of the picket spread to other BPU facilities in other locations on March 8, 1984. In addition to the Nearman Creek employees, union employees at all three BPU power stations and also at the Riverview Electric Line Department and Muncie Water Department facilities stopped working and refused to obey direct orders of their supervisors to return to work. Approximately 256 employees were involved in the work stoppage on March 8, 1984.

In the 8:30 a.m. conversation on March 8, 1984, the BPU general manager and the union representative discussed BPU's further identification of the contractors' gate as the Creole gate. By 10:00 a.m. on March 8, BPU had the gate so designated. The picket remained, however, at the employees' gate until afternoon.

Due to the failure to remove the picket and the resulting employee work stoppage, BPU obtained a temporary restraining order from the district court at approximately 11:45 a.m. on March 8, 1984. This was served on the union representatives at 2:00 p.m. on March 8. The picket was then removed from the employees' gate. BPU employees on the 3:00 p.m. shift at the Nearman Creek station reported to work that day. All BPU employees were back to work on March 9, 1984.

The working rules which BPU has entered into with its unions prohibit strikes. The working rules also obligate a union within 24 hours of commencement of any of the acts prohibited by the rules to take all reasonable affirmative action to terminate such conduct.

A hearing was held in district court on March 14, 1984, to

determine whether a temporary injunction should issue. The district court issued an injunction prohibiting placement of an informational picket at the employees' gate, rather than the contractors' gate, and prohibiting the employees from striking and picketing in connection with strikes, and further enjoined the unions from any further acts which would cause work stoppages or strikes. The court found the unions responsible for the work stoppage since they did some of the acts which precipitated the strike.

After the issuance of the injunction, there were no further work stoppages. The maintenance work was completed in April, 1984.

The first argument made by appellant IAM is that the state court's jurisdiction is preempted by the National Labor Relations Act (NLRA). Appellant contends the activity of which BPU complained here was a secondary boycott in violation of 29 U.S.C. § 158(b)(4) (1982) and is hence under the exclusive jurisdiction of the National Labor Relations Board (NLRB) to remedy. We disagree. In *Sheet Metal Wkrs. Int. Ass'n, Loc. 223 v. Altas Sheet Metal Co.*, 384 F.2d 101, 105 (5th Cir. 1967), the court defined secondary boycott as a labor organization's unlawful pressure on a neutral employer where the object of the union is to force such employer to cease doing business with another employer or to force any other employer to recognize or bargain with an uncertified union. This dispute does not fit the definition of a secondary boycott. Further, the NLRA *specifically* excludes government employers from its jurisdiction. See 29 U.S.C. § 152(2) (1982). It is contended BPU's engagement in interstate commerce nullifies that exclusion. Again we disagree. The fact that BPU is engaged in interstate commerce does not change the rule that government employers are excluded from NLRB jurisdiction. See *State v. Brotherhood of R.R. Trainmen*, 37 Cal. 2d 412, 232 P.2d 857, *cert. denied* 342 U.S. 876 (1951). Thus, appellant's argument is without merit.

The next issue raised is by appellees. Appellees argue the case should be dismissed as moot. The work by the nonunion subcontractor was completed in April of 1984. Appellees contend since the contract is completed, the order of the court may be dissolved. The order of the court was:

"This Order will remain in full force and effect until the completion of the contract referenced in Paragraph 13 herein, but shall not expire until the further Order of the Court."

Thus, although the incident is past and the contract referred to in the court's order is expired, the court's order stands. The issue is, therefore, not moot. See *Allee v. Medrano*, 416 U.S. 802, 40 L.Ed.2d 566, 94 S.Ct. 2191 (1974).

Appellants' final argument is that the trial court lacked jurisdiction to issue the injunction pursuant to K.S.A. 60-904(c), the Kansas anti-injunction act, which provides:

"No restraining order or injunction shall prohibit any person or persons, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means to do so; or from attending at or near a house or place where any person resides or works, or carries on business, or happens to be for the purpose of peacefully obtaining or communicating information, or of peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute; or from recommending, advising, or persuading others by peaceful means to do so; or from paying or giving to or withholding from any person engaged in such dispute any strike benefits or other moneys or things of value; or from peaceably assembling at any place in a lawful manner and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto, or from any activity over which the federal authority is exercising exclusive jurisdiction."

The question here is whether this applies to public employees. The Kansas Public Employer-Employee Relations Act (PERA), K.S.A. 75-4321 *et seq.*, specifically states: "[T]he provisions of K.S.A. 60-904 shall not control injunction actions arising out of public employer-employee relations under this act." K.S.A. 75-4334(c). The problem with the application of that language here is that under the PERA, government agencies other than the state must elect to be covered and BPU did not elect to be so covered. Appellants argue this means BPU must come under K.S.A. 60-904(c). Appellees argue, in the absence of coverage by the PERA, the common law regarding public employees applies rather than K.S.A. 60-904. The common law which appellees seek to apply here prohibits strikes by public employees and allows state courts to issue injunctions to enforce the law. For support appellees cite Rock, *Some Thoughts on Labor Unions and Public Employees in Kansas*, 39 J.B.A.K. 119 (1970), which states:

"Public employees do not have a lawful right to 'strike.' . . . The Kansas anti-injunction act, K.S.A. 60-904, is presumably inapplicable to the relationship of public employer and public employee." 39 J.B.A.K. at 205.

We discussed the reasoning behind this in a case prior to the enactment of the PERA. In *Wichita Public Schools Employees Union v. Smith,* 194 Kan. 2, 397 P.2d 357 (1964), arising from a 1962 occurrence, we stated: "The objects of a political subdivision are governmental—not commercial. It is created for public purposes and has none of the peculiar characteristics of enterprises maintained for private gain." 194 Kan. at 5. This reasoning was adopted by the legislature in the PERA, which in K.S.A. 75-4321(a) provides:

"(3) the state has a basic obligation to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government;

"(4) there neither is, nor can be, an analogy of statuses between public employees and private employees, in fact or law, because of inherent differences in the employment relationship arising out of the unique fact that the public employer was established by and is run for the benefit of all the people and its authority derives not from contract nor the profit motive inherent in the principle of free private enterprise, but from the constitution, statutes, civil service rules, regulations and resolutions. . . ."

Professor Goetz, in his article *The Kansas Public Employer-Employee Relations Law,* 28 Kan. L. Rev. 243 (1980), notes the League of Kansas Municipalities and other organizations proposed several public employer-employee relations bills prior to the present PERA, since they felt strike action could not be enjoined due to K.S.A. 60-904(c). 28 Kan. L. Rev. at 245.

Let us examine the issue. The common law includes those principles, usages, and rules of action which do not rest for authority upon any express statute or written declaration. It is the great body of unwritten law founded upon common consent, natural justice and reason. By its very nature the common law exists only where there is no statutory law. It is the law of necessity. 15A Am. Jur. 2d, Common Law § 1, p. 594.

This case hardly meets that test. The common law is no longer applicable here due to the existence of statutory authority covering the issue of public employee strikes. In 1963 the legislature passed K.S.A. 60-904(c). The passage of this anti-injunction act with no exceptions effectively removed the remedy for enforcing the common-law ban on public employee strikes. In 1971, when the legislature enacted the Kansas Public Employer-Employee Relations Act, it restored the injunctive remedy by providing in K.S.A. 75-4334(c):

"The procedures for obtaining injunction and allied remedies shall be as set forth

in the code of civil procedure, except that the provisions of K.S.A. 60-904 shall not control injunction actions arising out of public employer-employee relations under this act."

Obviously, there was no reason for the legislature to place public employees out of the reach of the anti-injunction act if they were already there. Thus, we must conclude, absent the provisions of K.S.A. 75-4334(c), public employees are included in the ban on injunctive relief of K.S.A. 60-904(c). BPU voluntarily agreed to meet and confer with the unions as agents for their members but refused to elect to bring itself under PERA pursuant to K.S.A. 75-4321(c). It thereby denied itself the remedy of injunction. It must live with that choice. Public employers who fail to elect to come under PERA are subject to the provisions of K.S.A. 60-904(c). The injunction was granted in error and is hereby dissolved.

The judgment of the trial court is reversed and the cause remanded for a determination of damages, including reasonable attorney fees, for appellants.

SCHROEDER, C.J., dissenting.

McFARLAND, J., concurring in part and dissenting in part: I concur with the majority opinion except for its discussion and conclusions relative to K.S.A. 60-904(c) and K.S.A. 75-4334.

As the majority opinion correctly notes, the common law prohibits strikes by public employees. Such a strike is, per se, unlawful. The anti-injunction provision contained in K.S.A. 60-904(c) is, therefore, inapplicable and a public employee strike is an unlawful act rather than a labor dispute.

The enactment of the Kansas Public Employer-Employee Relations Act (PERA), K.S.A. 75-4321 *et seq.*, grants a public employer the right, at its option, to elect to come under the act. K.S.A. 75-4333(c)(5) makes it a prohibited practice for a public employee under the act to engage in a strike and thereby continues the common law relative thereto. K.S.A. 75-4334(a) states any controversy concerning prohibited practices may be submitted to the Public Employee Relations Board (PERB). K.S.A. 75-4334(c) provides:

"(c) The board is hereby authorized to file a petition in the district court to enforce its final orders until such time as they are modified or set aside by the court. The procedures for obtaining injunction and allied remedies shall be as set

forth in the code of civil procedure, except that the provisions of K.S.A. 60-904 shall not control injunction actions arising out of public employer-employee relations under this act."

I do not believe the enactment of the Kansas Public Employer-Employee Relations Act has any effect on public employers and employees not under the act. K.S.A. 75-4334(c), as pertinent herein, only results in assuring that public employers coming within the act are on the same footing as those not under the act—that is, K.S.A. 60-904(c) is inapplicable to any public employee strike.